```
                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                       FORT MYERS DIVISION
```

WILLIAM MORALES,

                Plaintiff,

vs.                            Case No. 2:10-cv-249-FtM-29SPC

CAPTAIN ELLIS,

                Defendant.
_____

## **OPINION AND ORDER**

### **I. Status**

This matter comes before the Court upon review of Defendant Ellis' Motion for Summary Judgment (Doc. #14, Motion). Defendant submits the following exhibits in support: a closed circuit video recording of the incident at issue without sound (Exh. A, *in camera*); Affidavit of Rodney Ellis (Exh. B), Affidavit of Richard Malo (Exh. C), and Affidavit of Suzanne Vanhise-Fowles (Exh. D).

Plaintiff filed a pleading entitled "Amended Motion for Summary Judgment," after being granted leave, in response to Ellis' Motion (Doc. #30, Plaintiff's Motion). Plaintiff's Motion attaches the following exhibits in support: a blank "Refusal of Health Care Affidavit" form (Exh. A), declaration of William Morales (Exh. B), and declaration of Gary Burton (Exh. C).[1]

---

[1]The statements submitted by Morales and Burton are each labeled as an "Affidavit" but were not sworn to by the declarants before an officer authorized to administer oaths, such as a notary public. Under 28 U.S.C. § 1746, a declaration submitted "under the penalty of perjury, and dated" is admissible in lieu of a sworn

(continued...)

As directed, Defendant filed a response to Plaintiff's Motion and argues that, although framed as a Motion, the pleading actually presents only argument in opposition to Ellis' Motion summary judgment (Doc. #32, Ellis' Response). Defendant points out that Plaintiff acknowledges that there are material facts in dispute; and, therefore Plaintiff cannot obtain summary judgment. Ellis' Response at 3. After obtaining leave from the Court, Plaintiff filed a reply to Ellis' Response (Doc. #38, Plaintiff's Reply) with the following supplemental exhibits: an undated statement by Albert Walker,[2] declaration of Gary Burton, blank "Refusal of Health Services Affidavit" form, and blank "Consent /Refusal Form." Plaintiff contends that the counter-statements he submits creates "genuine issues of material fact" and the Court should deny summary judgment to Defendant. Plaintiff's Motion at 2, ¶7.

Upon review of Plaintiff's Motion, Ellis' Response, and Plaintiff's Reply, the Court construes Plaintiff's "Motion" as a

---

[1](...continued)
affidavit on a motion for summary judgment. Consequently, the Court construes the statements by Morales and Burton admissible evidence as declarations.

[2]Walker's statement is labeled an "Affidavit," but it fails to comply with the procedural requirements to be considered either an affidavit or a declaration. The statement by Walker is not dated and is not sworn to under penalty of perjury. See Wells v. Cramer, 262 F. App'x 184, 2008 WL 110088 *3 (11th Cir. 2008)(stating "Federal law . . . does not provide an alternative to making a sworn statement, but requires that the statement include a handwritten averment, signed and dated, that the statement is true under the penalties of perjury."). Consequently, the Court does not consider Walker's Affidavit as evidence in this matter.

response in opposition to Defendant's Motion, not as a cross motion for summary judgement. Defendant's motion is ripe for review.

## II. Summary Judgment Standard

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of fact and compels judgment as a matter of law." Swisher Int'l, Inc. v. Schafer, 550 F.3d 1046, 1050 (11th Cir. 2008); Fed. R. Civ. P. 56(c). An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004). The standard for creating a genuine dispute of fact requires courts to "make all *reasonable* inferences in favor of the party opposing summary judgment," Chapman v. Al Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)(en banc) (emphasis added), not to make all *possible* inferences in the non-moving party's favor. "A factual dispute alone is not sufficient to defeat a properly pled motion for summary judgment." Teblum v. Eckerd Corp. of Fla., Inc., 2:03-cv-495-FTM-33DNF, 2006 WL 288932 *1 (M.D. Fla. Feb. 7, 2006).

Instead, "[o]nly factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment." Lofton v. Sec'y Dep't of the Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004)(citing Anderson, 477 U.S. at 247-48). The moving party bears the burden of demonstrating to the Court that based upon the record no genuine issues of material fact exist that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d at 1260(citing Celotex, 477 U.S. at 323). Further, "allegations in affidavits must be based on personal knowledge, and not be based, even in part, 'upon information and belief.'" Pittman v. Tucker, 213 F. App'x 867, 870 (11th Cir. 2007)(quoting Pace v. Capobianco, 283 F.3d 1275, 1278 (11th Cir. 2002)).

To avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion "bears the burden of persuasion" and must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, and "set forth specific facts showing that there is a genuine issue for trial." Beard v. Banks, 548 U.S. 521, 529 (2006)(citations omitted); Celotex, 477 U.S. at 322; Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1225 (11th Cir. 1999). If there is a conflict in the evidence, the non-moving party's evidence is to be believed and "all justifiable inferences", Anderson, 477 U.S. at 255, must be drawn in favor of the non-moving

party, but those inferences are drawn "only to the extent supportable by the record," Penley v. Eslinger, 605 F.3d 843, 848 (11th Cir. 2010)(citation omitted). The court, however, "must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, [the court's] inferences must accord deference to the views of prison authorities." Beard, 548 U.S. at 530. "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" Cuesta v. Sch. Bd. of Miami-Dade County, 285 F.3d 962, 970 (11th Cir. 2002) (citations omitted). Nor are conclusory allegations based on subjective beliefs sufficient to create a genuine issue of material fact. Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). In the summary judgment context, however, the Court must construe *pro se* pleadings more liberally than those of a party represented by an attorney. Loren v. Sasser, 309 F.3d 1296, 1301 (11th Cir. 2002).

### III. Finding of Facts and Applicable Law

Plaintiff is involuntarily confined at the Florida Civil Commitment Center ("FCCC") pursuant to the Florida Sexual Violent Predator (SVP) Act. The State of Florida enacted the SVP Act by which a person determined to be a sexually violent predator[3] is required to be housed in a secure facility "for control, care, and treatment until such time as the person's mental abnormality or personality disorder has so changed that it is safe for the person to be at large." Fla. Stat. § 394.917(2). The SVP Act was promulgated for the dual purpose "of providing mental health treatment to sexually violent predators and protecting the public from these individuals." Westerheide v. State, 831 So. 2d 93, 112 (Fla. 2002).

Plaintiff initiated this action by filing a *pro se* Civil Rights Complaint (Doc. #1, Complaint). Plaintiff alleges that his Due Process rights under the Fourteenth Amendment were violated as a result of Defendant Ellis subjecting Plaintiff to an unnecessary and excessive use of force on April 1, 2010. Id. at 2.

---

[3]A "sexually violent predator" is defined by the Act as any person who:

(a) Has been convicted of a sexually violent offense; and

(b) Suffers from a mental abnormality or personality disorder that makes the person more likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment.

Section 394.912(10), Fla. Stat. (2008).

**A. Undisputed Facts**

The following facts are undisputed by the parties. On April 1, 2010, Plaintiff returned to the FCCC from the hospital after having "a heart catheter procedure where a number of stents were implanted." Complaint at 2. Plaintiff was seen in the FCCC's medical wing "for a routine reentry evaluation." Id. Medical staff recommended that Plaintiff needed to spend the evening in the medical wing. Id. Plaintiff refused to stay in the medical wing, because he finds the medical wing's "environment" to be "highly stressful." Id. When Plaintiff refused to stay in the medical wing, medical staff called security. Id. Defendant Ellis arrived and told Plaintiff he could not refuse medical's directive to stay in the medical wing. Id. Plaintiff advised Ellis that he has a "right to refuse any medical procedure" and "attempted to leave" the medical infirmary. Ellis, after following Plaintiff, applied force to return Plaintiff to the infirmary. Id.

**B. Disputed Facts**

**1. Plaintiff's version of events**

The parties agree that Ellis used some amount of force on Plaintiff to return Plaintiff to the FCCC's medical infirmary. According to Plaintiff:

> Captain Ellis grabbed me from behind and twisted my arm up and behind me to the extent that something internally was torn. Captain Ellis then slammed my head against a concrete wall causing a large welt to form on my head. Captain Ellis then kicked my right leg were my surgical incision was located. When I complained of this [,] he

> slammed a steel door on the same leg several times. With my injured arm still behind my back [,] he then escorted me to a security cell [,] locking me within.

Complaint at 2.

Plaintiff claims that, as a result of Ellis' actions, he sustained injuries to his neck and shoulder, is unable to sleep due to pain, has a limited range of motion, and experiences "intense headaches and dizziness." Id. Plaintiff seeks unspecified compensatory and punitive damages. Id.

In support of his version of events, Plaintiff submits his own declaration (Doc. #30-2) and the declaration of resident Burton (Doc. #30-3). Plaintiff states a nurse, Suzanne Vanhise-Fowles, advised him that he was required to spend the night in the infirmary due to "protocol." Doc. #30-2 at 1, ¶3. Plaintiff told the nurse that Dr. Lamour, the FCCC physician, had previously permitted Plaintiff to return to his housing area because the infirmary causes Plaintiff's "blood pressure to rise." Id. at 1, ¶4. Plaintiff advised the nurse that he would sign a "refusal" form. Id., ¶5. The nurse called security and Defendant Ellis arrived. Id. at 2, ¶7. Ellis is "an extremely large and powerful individual." Id., ¶8-9. Plaintiff advised Ellis that he had a right to refuse medical treatment. Id., ¶10. When Plaintiff attempted to leave the medical wing, Ellis "pulled" his arm behind his back, injuring his shoulder. Plaintiff claims that the ligaments in his shoulder "are torn almost in half" and he has been scheduled for surgery. Id., ¶16-17. Plaintiff claims that the

videotape of the incident submitted by Defendant "has been skillfully edited" and the "incriminating actions of Mr. Ellis have been removed from this video." Id. at 3, ¶20-21. In particular, Plaintiff states that the video shows Ellis attempting to open the door and Plaintiff "in the way" and then the two walking through the door. Instead, Plaintiff claims that Ellis "slammed the door into [Plaintiff's] leg three times," during which time the nurse shouted that Plaintiff had sutures in his leg. Id., ¶22. Resident Burton attests that he "saw Ellis bend the arm of Morales behind his back and push Morales against the wall." Doc. #30-3 at 2, ¶9.

### 2. Defendant's version of events

Defendant concedes that he used force on Plaintiff in order to gain Plaintiff's compliance to return to the infirmary, as ordered by medical staff. Motion at 4-5. However, Defendant claims that Plaintiff posed a security threat to the FCCC. Id. at 5, ¶25. Consequently, Defendant was required to use force, but asserts that he applied only the "minimum amount of force necessary to control" Plaintiff. Id. at 5, ¶25.

In support, Defendant submits his own Affidavit (Doc. #14-1), the Affidavit of Richard Malo (Doc. #14-2), and Affidavit of Suzanne Vahhise-Fowles (Doc. #14-3), as well as a videotape of the incident (Exh. A). Suzanne Vanhise-Fowles is a nurse assigned to the FCCC medical infirmary. Nurse Vanhise-Fowles testifies that she advised Plaintiff that "it was protocol to stay overnight in

the infirmary. . . [and] it would be unsafe for him to leave the infirmary." Doc. #14-3 at 1, ¶4-5. Plaintiff became verbally abusive toward Defendant Ellis. Id. at 2, ¶9. Plaintiff "began to leave the infirmary and was called back by staff." Id. at 2, ¶6. Nurse Vanhise-Fowles considered Plaintiff to pose "a very serious security threat." Id., ¶13.

According to Richard Malo, a Therapeutic Security Technician ("TST") he heard "yelling in the infirmary [and] went to see what was going on." Doc. #14-2 at 1, ¶¶1, 3, 4-5. When TST Malo arrived, he saw Plaintiff arguing with Ellis in the hall telling Ellis "he could not force him into the infirmary." Id., at 2, ¶7. TST Malo saw Ellis "place [Plaintiff] against the wall." Id., at 2, ¶7. TST Malo saw Ellis place Plaintiff's right arm behind him and escort Plaintiff back to an isolation room in the infirmary. Id., ¶8. TST Malo viewed Plaintiff as a "security threat" and was "concerned" that Plaintiff "would get out of control." Id., ¶11.

Defendant Ellis states that he was called to medical and advised that a physician ordered Plaintiff to stay in the infirmary "due to his medical condition and recent procedure." Doc. #14-1 at 1, ¶4. Ellis ordered staff to lock the doors of the infirmary. Id., at 2, ¶5. Plaintiff "became angry and started punching the desk within the infirmary." Id., ¶9. Plaintiff became verbally abusive toward Ellis and refused to stay in the infirmary. Id., ¶10. Ellis followed Plaintiff into the hallway and attempted to verbally convince Plaintiff to return to the infirmary as ordered

by the physician. Id., ¶12. Ellis ordered Plaintiff to return to the infirmary, but Plaintiff continued walking down the hall away from the infirmary. Id., ¶13. Ellis placed his hand on Plaintiff's back and told him he would escort him back to the infirmary. Id., ¶14. When Plaintiff pulled away from Ellis, Ellis placed Plaintiff against the wall in order to hold him. Id., ¶16. Ellis again advised Plaintiff that a physician ordered Plaintiff to stay in the infirmary. Id., ¶19. When Ellis and Plaintiff reached the door into the infirmary, Plaintiff attempted to pull away again. Id. at 3, ¶20. Ellis held Plaintiff against the window in order to prevent Plaintiff "from getting away and posing a further security threat." Id., ¶21. After opening the door, Ellis placed Plaintiff into an isolation room in the infirmary. Id., ¶22.

The Court has reviewed the video submitted by Defendant. Exh. A. The video is comprised of two parts: the first part depicts the events in the infirmary, and the second part depicts the events in the hallway. The first part shows Plaintiff sitting at a table with a blood pressure machine to his right and the nurse to his left taking his pulse. The nurse appears to be speaking with Plaintiff, but he is staring in the opposite direction away from her. The door to the infirmary opens and Defendant Ellis walks in and approaches the opposite side of table at which Plaintiff is seated. Plaintiff and Ellis can be seen conversing and Plaintiff appears to be getting agitated. Plaintiff is gesturing with his hands and running his hands through his hair. At this point

Plaintiff is yelling, he stands up, his mouth is open wide, and he is gesturing more rapidly with his arms. Plaintiff is holding a thick folder in his right hand; and, then abruptly take the folder and reaches up over his head, slamming the folder down on the table. Plaintiff then pounds on the table with his right fist and walks rapidly out of the door of the infirmary. Ellis follows Plaintiff through the door. Some 27 seconds later,[4] Ellis and Plaintiff are seen walking back through the infirmary door. Ellis is standing behind Plaintiff holding Plaintiff's right arm, which is bent behind Plaintiff's back. Ellis leads Plaintiff into a room to the right of the door, at which time other staff arrive.

The second video depicts a hallway with a door at the end. Defendant Ellis is seen walking down the hall and attempting to enter the doorway into the infirmary, which appears to be locked as he waits for the door to open. After some time, Plaintiff is seen coming through the door into the hallway with Ellis following close behind him. Defendant Ellis appears to speaking with Plaintiff and Plaintiff raises his right hand up in the air with his palm facing Ellis. Ellis then places his right hand on Plaintiff right upper arm in an apparent attempt to turn Plaintiff around. Plaintiff pulls away from Ellis and Ellis turns Plaintiff toward the wall and turns Plaintiff's right arm up toward Plaintiff's back. Plaintiff

---

[4]The video cameras appear to be triggered by movement. There is a running timer on the videos at the top that moves in fractions of a second.

again attempts to pull away from Ellis and Ellis again directs Plaintiff back toward the wall, but not into the wall. Ellis successfully turns Plaintiff back toward the door they exited, holding Plaintiff with his left arm as he attempts to open the door with his right hand. Ellis appears to be attempting to open the door, but Plaintiff's body and Ellis' body are in the way. Eventually, Ellis moves Plaintiff to the left of the door and gets the door open to go through the door with Plaintiff in front of him. A total of approximately 27 seconds elapsed during the time in which Plaintiff and Ellis are together in the hallway.

**C. Applicable Law**

Plaintiff is civilly committed, and the FCCC is not a prison and Plaintiff is not a prisoner. Troville v. Venz, 303 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has recognized that an individual who has been involuntarily civilly confined has liberty interests under the Due Process Clause of the Fourteenth Amendment that "require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." Youngberg v. Romeo, 457 U.S. 317, 319 (1982). Thus, the Supreme Court has opined that, at least in regards to certain aspects of civil detainees' confinement, they are afforded a higher standard of care than those who are criminally committed.[5] See Id. at 321-322; Dolihite v. Maughon, 74 F.3d 1027, 1041 (11th Cir.

---

[5]In Youngberg, the issue was whether a severely retarded young man had received proper treatment in a state facility. Id. at 309.

1996)(holding that "persons subjected to involuntary civil commitment are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."). See also Lavender v. Kearney, 206 F. App'x 860, 863 (11th Cir. 2006).

This, however, does not mean that civil detainees are free to live within the FCCC without any restrictions or limitations. FCCC residents, like pretrial detainees who are facing criminal charges or detainees confined in mental hospitals, are not entitled to the same unrestricted liberties as persons in the outside world. While residents may object to having to comply with the FCCC's rules and restrictions, and/or orders given by staff at the institution, neither the fact of their existence or their imposition gives rise to a constitutional violation because such does not constitute punishment. Indeed, the Supreme Court observed this point, opining in pertinent part, as follows:

> Once the Government has exercised its conceded authority to detain a person . . . it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

Bell v. Wolfish, 441 U.S. 520, 537 (1979).

The need to curtail potentially violent conduct is an "obligation" incumbent upon the operators of the FCCC. Washington v. Harper, 494 U.S. 210, 225 (1990) (stressing that the state has not only an interest, but an obligation, to combat any danger posed by a person to himself or others, especially in an environment, which "by definition is made up of persons with a demonstrated proclivity for antisocial criminal, and often violent, conduct." (internal quotations and citations omitted)). Consequently, staff at the FCCC are tasked with the arduous responsibility of rendering treatment consistent with the goals of the SVP Act while ensuring the safety of not only themselves and other administrative personnel, but of all residents who are confined at the FCCC. The Supreme Court has recognized that the "interest in institutional security" and "internal security" is "paramount." Hudson v. Palmer, 468 U.S. 517, 528 (1984).

The Eleventh Circuit recognizes that the Fourteenth Amendment protects pretrial detainees from the use of excessive force; however, because the Eighth Amendment standard is the same, "decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees." Cottrell v. Caldwell, 85 F.2d 1480, 1490 (11th Cir. 1996). See also, Smith v. Vavoulis, 373 F. App'x 965, 966 (11th Cir. 2010); Williams v. Scott, No. 10-

12075. 2011 WL 2672534 *2 (July 8, 2011)(applying Cottrell in case involving FCCC resident alleging excessive sue of force).[6]

Under the Eighth Amendment, to establish an excessive use of force claim, a plaintiff must satisfy an "objective" and "subjective" prong. Smith, 373 F. App'x at 966 (citing Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999). To meet the "objective" prong, the amount of force must be more than *de minimis*, provided that the type of force is not of the kind that is "repugnant to the conscience of mankind." Hudson v. MacMillan, 503 U.S. 1, 10 (1992). To fulfill the "subjective" prong the plaintiff must demonstrate that the force was applied maliciously and sadistically for the purpose of causing harm. Smith, 373 F. App'x at 966. The court examines the following five factors in evaluating whether the force was applied maliciously and sadistically:

> (1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as

---

[6]But see Enriquez v. Kearney, 694 F. Supp. 2d 1282, 1291-1292 (S.D. Fla. 2010)(recognizing that the Eighth Amendment's "malicious or sadistic" intent is at odds with the Fourteenth Amendment's punishment benchmark and evaluating claim under the "revised" test adopted in Telfair v. Gilbert, 868 F. Supp. 1396, 1404 (S.D. Ga. 1994), which requires a lesser showing of intent than that set forth by the Eighth Amendment. Namely, whether there is direct evidence that the use of force was intended to punish the detainee. If not, (1) whether a legitimate use of force is evident from the circumstances, and (2) if so, whether the force was necessary to further that interest. Telfair at 1412.).

-16-

reasonably perceived by the responsible officials on the basis of facts known to them.

Id.

### D. Application of Law to Facts

Based upon a review of the record, the Court finds that Plaintiff cannot demonstrate either prong to sustain his burden of showing that Defendant Ellis violated his Fourteenth Amendment rights by applying an excessive use of force. Here, the video reveals that the entire series of events was recorded, albeit without sound, by at least two different closed-circuit cameras. "Where the video obviously contradicts Plaintiff's version of he facts, [the Court] accepts the video's depiction instead of Plaintiff's account." Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010)(citations omitted). Nothing but plaintiff's conclusory, self-serving statements indicates that the video is not accurate, and this is insufficient to create a material issue of disputed fact.

Here, the evidence reveals Defendant Ellis applied at most, *de minimis* force, and only after Plaintiff's actions were received by officials as presenting a threat to the order and security in the infirmary. Defendant Ellis placed his right hand on Plaintiff's right arm in the hallway in an attempt to stop Plaintiff from further retreating from the infirmary ward. Ellis then moved Plaintiff's arm to behind his back to gain control of Plaintiff because Plaintiff attempted to break loose from Ellis' hold.

Although, Ellis turned Plaintiff toward the wall, at no time did Ellis bang Plaintiff's head off the wall as alleged by Plaintiff. Thus, Plaintiff cannot meet the objective prong.

Even assuming *arguendo* that Plaintiff can objectively show that Defendant Ellis applied more than a *de minimis* use of force, the evidence clearly and unequivocally demonstrates that Plaintiff cannot overcome the hurdles erected by the subjective prong. Plaintiff alleges that he sustained a torn ligament, but fails to introduce any evidence that his injury was related to Ellis' use of force, as opposed to Plaintiff's hyper-extension of his arm well behind his head to slam the manilla folder onto the table, as well as his pounding on the table. Further, Nurse Vanhise-Fowles had advised Plaintiff and Defendant Ellis that Plaintiff was not permitted to leave the infirmary. Defendant Ellis ordered Plaintiff, consistent with the directive from medical, to remain in the infirmary. Plaintiff disregarded both the medical order and Ellis' order and was leaving the medical ward without permission. Thus, Ellis was required to use force to stop Plaintiff from leaving the area of the infirmary.

The type of force used by Defendant Ellis was limited to the most basic of physical force - - Ellis' placement of his hands on Plaintiff's back, right arm and right shoulder. Significantly, Defendant Ellis did not use any type of weapon or apply chemical agents of any kind.

The video, as well as Nurse Vanhise-Fowles and TST Malo's affidavits attest to the fact that Defendant Ellis first attempted to talk and counsel Plaintiff. Plaintiff, however, exhibited hostile behavior and his demeanor alarmed staff. Plaintiff's behavior created a security risk within the infirmary, as well in the hallway, therefore justifying Defendant Ellis' use of force to quell Plaintiff's potential threat to himself and others.

Plaintiff argues that he had a right to refuse to stay in the infirmary. See generally Reply. Plaintiff attaches copies of the FCCC's "Refusal of Health Care Services Affidavit." Doc. #38-3. FCCC officials not only have the authority, but are charged by law with an affirmative constitutional duty to provide proper and necessary medical treatment to a resident with a serious medical need. Estelle v. Gamble, 429 U.S. 97 (1976). This affirmative duty to provide medical treatment arguably must yield to an individual's liberty interest in rejecting unwanted medical treatment. Cruzan by Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 278 (1990). Plaintiff in the instant Complaint, however, does not assert that his right to refuse medical treatment was violated. See generally Complaint. Further, Plaintiff submits only a blank refusal of consent form and does not allege, let alone demonstrate, that he executed a refusal of consent form. In any event, the right to refuse medical treatment does not translate into a right to become belligerent, verbally hostile, and exhibit an aggressive demeanor.

Consequently, based upon the record before the Court and the applicable law, the Court finds that Defendant Ellis is entitled to summary judgment as a matter of law.

ACCORDINGLY, it is hereby

**ORDERED:**

1. Defendant Ellis' Motion for Summary Judgement (Doc. #14) is **GRANTED**.

2. The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions and deadlines, and close this file.

**DONE AND ORDERED** at Fort Myers, Florida, on this   21st   day of September, 2011.

_____
JOHN E. STEELE
United States District Judge

SA: hmk
Copies: All Parties of Record